IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) | 8:05CR93 |
| v. | ) ) ) | MEMORANDUM AND ORDER |
| RUDOLPH GEORGE STANKO, | ) ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motions to withdraw, Filing Nos. 103 and 107; motions to suppress, Filing Nos. 125, 133, and 138, and plaintiff's objections to the motions to suppress, Filing No. 150; defendant's motion to correct erroneous docket sheet, Filing No. 162; motion for complete discovery, Filing No. 164; and miscellaneous matters.  The court has reviewed the record, evidence, case law, and briefs, including the brief filed by the defendant in opposition to the gun act felony, Filing No. 183, and finds as hereinafter set forth.

**1. Motions to Suppress**

The court conducted a hearing on defendant's motions to suppress on December 28, 2005.  The government objected to the timing of the motions to suppress.  Filing No. 150. However, after hearing the argument of counsel, the court overruled the objections. Defendant argues that the March 7, 2005, search of his residence violated his Fourth, Fifth and Fourteenth Amendment rights as it constituted an unreasonable search and seizure. He argues the same legal theories, Fourth, Fifth and Fourteenth Amendments, with regard to the March 10, 2005, search which resulted from a warrant issued by Magistrate Judge F.A. Gossett.  Defendant contends in his third motion to suppress that the guns obtained

during the searches belong to a corporation known as Montana Feeders, Inc., not to the defendant.

## A. Facts

Officer Clay Heath of the Gordon Police Department, which covers the city limits of Gordon, Nebraska, testified that his office and the sheriff's office have a cooperative agreement where at times they assist each other.[1] On or about March 7, 2005, Sergeant Jeff Brewer of the Gordon Police Department briefed Officer Heath, telling him that a Brenda Berg a/k/a Brenda Stanko (Berg/Stanko) had filed an action for dissolution and a protection order against defendant Rudy Stanko.[2] Sergeant Brewer believed, because of a phone call he received from CL, that defendant would be agitated and asked Officer Heath to keep an eye on the house[3] and Berg/Stanko's two daughters, CL and BL, and defendant's daughter, KS.[4] CL called the Sheridan County sheriff's office to report that she had seen defendant on the premises, in violation of the protective order. The sheriff's office called Officer Heath and asked him to respond. Officer Heath went to the yard line. He did not see the defendant, so he waited until Sheriff's Deputy Anthony Puchner arrived. The officers were unable to locate CL, so they returned to the headquarters of Officer Heath where they found CL waiting for them.

---

[1] Sheriff Terry Robbins of Sheridan County testified that he does in fact have an inter-jurisdictional agreement with City of Gordon and Sheridan County. Exs. 107, 108 and 109. It is his understanding that pursuant to these agreements, he or one of his deputies can request the assistance of the Gordon police officers.

[2] Berg/Stanko apparently had a common law marriage with Rudy Stanko in accordance with Montana law.

[3] All three daughters identified as CL, BL, and KS, and a friend known as KR, were minors at the time of the incidents in question in this case.

[4] The house in question is referred to as either RR1, Box 171, Sheridan County, or as 815 W. 2nd Street, and these addresses refer to the same residence.

CL reported that they had been locked out of the house. According to Officer Heath, CL asked the police if they could break down the door, and Officer Heath told them they could do so. CL testified that she asked the police what ways she could use to get inside the house, and Officer Heath told her she could kick in the door. She and a minor friend, KR, did in fact break into the house.

Officer Heath testified that CL volunteered that defendant, a previously convicted felon, had guns in his home. According to Officer Heath, CL expressed concern about the guns in the house. CL contends that Officer Heath raised the gun issue first, and she volunteered what she knew. Thereafter, CL left the police station. Prior to acting on this information, Officer Heath discussed this case with the County/City Attorney, John Friedenburg. Officer Heath testified that shortly thereafter, he went to the residence in question and asked CL if she would be more comfortable if the guns were removed. CL, according to Officer Heath, agreed and returned to the front porch with approximately eight guns in hand. Ex. 1. During this time period, a member of the Sheridan sheriff's office, Deputy Puchner, stood and watched the transaction occur and watched both entrances to the property. The sheriff's office had asked Officer Heath to take the lead, since he had established rapport with CL earlier that afternoon. Officer Heath took the guns to headquarters and Sergeant Brewer called ATF the next morning. Deputy Puchner testified that the purpose of going to defendant's home was to obtain the guns and that CL wanted to turn over the guns.

CL testified that she currently is a ranch hand south of Gordon. She testified that defendant lived in the house, that the guns belonged to the defendant, and that they were located in a cabinet in the basement. She also testified that defendant had abused her

mother in the past. She testified that she was upset and distressed and that defendant would get physical with her mother, Berg/Stanko. During her recorded statement, she indicated that she knew these guns would get defendant in trouble. Ex. 10, Tr. at 11-15. She further testified that she and KR voluntarily gave the guns to Officer Heath. She stated that she knew there was a gun cabinet in the basement, as she helped the defendant put it there.

BL testified that Officers Heath and McGinny asked CL if she was frightened and then asked for the guns. CL also testified that she told Agent Schiedeman that ammunition still remained in the house even after she turned the guns over to Officer Heath.

During the March 10, 2005, search, ATF agents also found a picture, Ex. 15, showing defendant holding a firearm. This picture was taken subsequent to his previous felony conviction. Although Berg/Stanko gave inconsistent testimony regarding this picture, she last testified that she told the agents where to find the photo, which was contained in her belongings. Berg/Stanko testified that she lived at the residence with the defendant, that they shared a bedroom, and that no one else shared the residence. She further testified that she had been afraid of the defendant, that he had abused her, and she made him remove guns from their bedroom.

Defendant testified that he is the corporate officer of Montana Feeders, Inc., and is the caretaker of the property in question. The residence is one-quarter to one-half a mile from the city limits. He testified that he rented the property under a verbal lease of $350 per month to Berg/Stanko and her children. He further testified that on December 21, 2005, he went to the city manager's office and told him to keep the Gordon police off of his property. The police had evidently been on Mr. Stanko's property the night before. He

believed the Gordon police were trespassing. Defendant filed a lawsuit against the Gordon police for trespassing and against Officer Heath as the process server, and the suit is still pending. He also testified that he lived part of the time with his mother and had on several occasions started proceedings to evict Berg/Stanko and her daughters. In one of his lawsuits, Stanko alleges that he is the Reverend Rudy Stanko and that Berg/Stanko is his intimate companion and wife. Ex. 16. He stated that at times other ranch hands lived at the ranch house.

**B. Discussion**

### *(1) Montana Feeders, Inc.*

The court will deal with the last issue first. Defendant contends that he is merely the caretaker for Montana Feeders, Inc., which he alleges owns the residence and ranch. However, the testimony established that Montana Feeders, Inc. is not a Nebraska corporation, there have been no state income taxes filed in Nebraska, and no corporate payroll records have been filed in Nebraska. Defendant offered no other evidence that would support his theory that this land, and consequently the guns and ammunition, were owned by the Montana Feeders, Inc. The evidence shows that Berg/Stanko, her children and the defendant's daughter had lived there for nine months, and the evidence likewise shows that defendant had lived there for a continuous period of time as well. Accordingly, the court finds that the defendant's motion to suppress on the basis that Montana Feeders, Inc. owned the residence in question should be denied.

### *(2) Seizure of the weapons*

Defendant first contends that Officer Heath, accompanied by Reserve Officer Luke McGinley, did not have jurisdiction to go onto his land. However, the court has carefully

reviewed the cooperation documents between Sheridan County and the City of Gordon, and the relevant Nebraska law, Filing Nos. 107, 108 and 109, and finds the agreements to be in compliance with the law. Neb. Rev. Stat. § 29-215. The court finds no support for defendant's assertion that only the sheriff, not his deputies, can authorize assistance by city police officers. This argument makes no sense from a practical perspective, as the court would foresee numerous instances where officers have to make quick decisions about the availability and need of additional assistance. If the officers were forced each and every time to receive the approval from the sheriff, many crimes could occur during the interim and public safety would be undermined. Accordingly, the court finds this claim to be without merit.

Defendant next argues that, in any event, the firearms should be suppressed as Officer Heath had no right to obtain these weapons. He contends that CL, age 17 at the time in question, acted as an arm of law enforcement and, thus, an illegal search occurred. Officer Heath testified that CL offered to turn over the guns, and CL testified that Officer Heath asked her to turn over the guns. Both CL and KR testified that the officers looked serious and would probably have been upset if they had refused. However, CL lived at that address and had done so for the previous nine months. She testified that she voluntarily gave the guns to Officer Heath. Neither CL nor KR testified as to any coercion or force or intimidation on the part of the police officers. In fact, they testified they were glad to get rid of the guns.

A search or seizure implicates the Fourth Amendment if it interferes with either a constitutionally cognizable privacy interest or a possessory interest. See *United States v. Jacobsen*, 466 U.S. 109, 121-22 (1984). A "seizure" of property occurs within the meaning of the Fourth Amendment when "'there is some meaningful interference with an individual's

6

possessory interests in that property.'" *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *Jacobsen*, 466 U.S. at 113). A "seizure of property is subject to Fourth Amendment scrutiny even though no search has occurred." *Lesher v. Reed*, 12 F.3d 148, 150 (8th Cir. 1994).

The court finds that CL, BI, and KS were lawfully in the residence. The officers were lawfully on the premisses. All three children had been living on the premises for at least nine months. The protective order allowed them to remain at this residence. CL had expressed concern to the police about the protective order and defendant's reaction to it. She had told police that she had seen his vehicle on the grounds. She had also expressed some concern about the guns on the premises. In her statement to Agent Schiedeman, CL stated that her mother had asked her to check the firearm cabinet behind the panel in the basement for firearms. CL did so, and that is how she found the firearms that the Gordon police confiscated. In a case where consent is obtained from a minor for a warrantless search, Nebraska law requires the court to look at the child's age, intelligence and maturity to determine voluntariness. *State v. Butzke, Sr.*, 584 N.W.2d 449, 371 (Neb. 1998). Although a search by the police officers did not technically take place in this case, a seizure did occur, and the court must determine whether CL voluntarily consented to turn the guns over to the police. *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973) (voluntariness a question of fact decided based on all the circumstances, and consent cannot be the result of coercion, or duress).

The court finds that CL was seventeen years of age at the time in question. From her testimony, the court concludes that she is very mature, independent and intelligent. The court has no doubt that CL was capable and mature enough to choose if she wanted to give the guns to the police. The court has already found that CL had a right to be in the

7

house and had been there for the previous nine months. In addition, CL's mother, Berg/Stanko, told her to go to the basement and check for guns. It is also clear that CL had been in that space before, as she testified in her statement to Agent Schiedeman that she helped carry the gun case to the basement, when at a previous time her mom had directed that the guns must be taken from the house. The court finds that Officer Heath reasonably believed that CL had the authority to be in the house and to voluntarily turn the guns over to the police.

Defendant also argues that CL acted as an agent for the police. A private citizen's conduct can bring into play the Fourth Amendment if the private citizen is acting as a government agent. *United States v. Huber*, 404 F.3d 1047, 1053 (8th Cir. 2005). Because CL voluntarily assisted the police and because she had her own motivations for turning over the guns, the court finds that CL did not act as an agent of the police. *See United States v. Marlbrough*, 922 F.2d 458, 461-62 (8th Cir. 1990); *United States v. Smith*, 383 F.3d 700, 704 (8th Cir. 2004). There is no evidence that the police coerced or intimidated or threatened CL or that CL felt obligated to turn over the guns. The fact that CL was "motivated in part by a desire to aid law enforcement does not in and of itself transform her into a government agent." *Smith*, 383 F.3d at 705. The court finds that CL did not act as an agent for the police in this case.

### (3) Search by ATF

The court finds that the search and seizure by the ATF is independent of the outcome of the confiscation of guns by Officer Heath. Sergeant Brewer contacted the ATF, based on the initial meeting with CL. The ATF did its own investigation, talking with CL and Berg/Stanko. Both individuals told ATF Agent Kyle Schiedeman that they had seen guns on the premises. CL had also seen ammunition at the residence. Thereafter, Agent

8

Schiedeman requested and received a search warrant for the residence and the defendant.[5]  Exs. 2 and 3.  ATF agents recovered 6,886 rounds of ammunition.  Exs. 5 and 6.  The search warrant clearly identifies the place and items to be searched.[6]  Even if this court construed the initial seizure of weapons to be improper, sufficient independent evidence existed for the issuance of the search warrant, and the fruits of the search are admissible under the good faith exception, as the officers relied on the affidavit and warrant in good faith.  *United States v. Leon,* 468 U.S. 897 (1984).

**2. Motions to Withdraw**

The court listened to the argument of counsel and has concluded that the motion to withdraw filed by David L. Nich, Jr., shall be denied.  Although defendant previously indicated that he had fired Mr. Nich and no longer needed Mr. Nich's legal services, during the hearing defendant asked that Mr. Nich remain as assistant attorney in his case.  Mr. Nich has agreed to continue this representation.  Accordingly, the court will deny this motion.  Filing No. 107.  With regard to the motion to withdraw filed by Roger Roots, defendant has also asked Mr. Roots to continue assisting with his case. Therefore, the motion to withdraw, Filing No. 103, is denied.

**3. Motion for Complete Discovery and Motion to Correct Docket Sheet**

During the court hearing the government represented to the court that it had supplied the defendant with the information requested in Filing No. 164.  Accordingly, the court will deny this motion as moot.  With regard to defendant's motion to correct

---

[5] Agent Schiedeman did not testify at the suppression hearing, as he was working on a case outside of the jurisdiction.

[6] There is a reference on the warrant/affidavit to attachments A, B and C.  There was testimony that those attachments did not exist and such reference was a clerical error and no impropriety or bad faith existed in this regard.  See *United States v. Curry*, 911 F.2d 72, 78 (8th Cir. 1990) (warrant valid where error is clerical rather than bad faith). The court finds such reference to be a clerical error.

9

erroneous docket sheet, Filing No. 162, the court finds that motion shall likewise be denied. The defendant contends that the court would not be as negative towards self-representation and the appellate record would be more accurate if the docket entry represented the date the defendant mailed each pleading rather than the date the clerk of court received each pleading. While the court is supportive of defendant's right to represent himself, the defendant must comply with all deadlines imposed by the court. In any event, all filings were permitted and the defendant's motion is denied.

**4. Other issues**

The court, during the suppression hearing, ordered the government to supply the defendant with all trial exhibits at least two weeks prior to the trial in this case, which is currently scheduled for January 30, 2006.

Also during the suppression hearing, counsel for the defendant requested a preliminary ruling on whether defendant's previous conviction is a felony subject to the felon-in-possession law. 18 U.S.C. § 922(g)(1). The government has now supplied the court with a certified copy of defendant's conviction, and the conviction has been upheld on appeal. *United States v. Cattle King Packing Co., Inc.*, 793 F.2d 232 (10th Cir. 1986). The court has reviewed the previous conviction of the defendant. The Colorado District Court jury convicted Mr. Stanko pursuant to a Federal Meat Inspection Act for multiple violations of 18 U.S.C. § 371 and 21 U.S.C. §§ 601-624, and §§ 661-680, which included counts for having more than 15,000 pounds of meat inspected with the intent to defraud, misbranding meat with an intent to defraud, preparing adulterated meat with intent to defraud, and misbranding meat with the intent to defraud. The Colorado District Court sentenced defendant on October 11, 1984; he reported to prison on August 13, 1986; and he was released on December 12, 1991.

Defendant argues that the business exception should apply and his conviction should not count as a previous felony. 18 U.S.C. § 921(a)(20). This section states:

> The term "crime punishable by imprisonment for a term exceeding one year" does not include–
>
> (A) any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices, or
>
> (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.
>
> What constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the proceedings were held. Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

The court has reviewed this exception to the felony conviction rule and preliminary rules that the felony exists for unfair trade and antitrust convictions. The court finds the exception set forth in 18 U.S.C. § 921(a)(20) does not apply to defendant's previous conviction. Congress intended to exclude "offenses relating to antitrust violations and similar business offenses." Conference Rep. No. 1956, 9th Cong. 2d Sess. 29 reprinted in 1968 U.S. Code Cong. & ad. News 4410, 4426, 4428. Defendant's previous conviction was based on the fraudulent distribution of adulterated meat products, the fraudulent misbranding of meat shipments, and circumvention of meat inspection laws. Accordingly, the court makes a preliminary finding that 18 U.S.C. § 921(a)(20) is not applicable in this case.

The court also ordered that the defendant is to have no direct contact with Berg/Stanko prior to or during trial of this matter. Stand-by counsel, however, is still permitted to confer with her.

THEREFORE, IT IS ORDERED:

1. Defendant's motions, Filing Nos. 103, 107, 125, 133, 138, 162, 164, are denied;

2. The government's motion, Filing No. 150, is denied;

3. The government shall provide the defendant with copies of all exhibits two weeks prior to trial;

4. Defendant shall have no direct contact with Berg/Stanko prior to or during trial in this matter;

5. The court makes a preliminary ruling that 18 U.S.C. § 921(a)(20) is not applicable in this case.

DATED this 10th day of January, 2006.

BY THE COURT:

**s/ Joseph F. Bataillon**
United States District Judge